UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RICARDO BETANCOURT,<br>     c/o Public Citizen<br>     1600 20th St NW<br>     Washington, DC 20009,<br><br>OSCAR GUTIERREZ,<br>     c/o Public Citizen<br>     1600 20th St NW<br>     Washington, DC 20009,<br><br>SEVERIANO GUTIERREZ,<br>     c/o Public Citizen<br>     1600 20th St NW<br>     Washington, DC 20009,<br><br>and<br><br>OLEGARIO LOPEZ,<br>     c/o Public Citizen<br>     1600 20th St NW<br>     Washington, DC 20009,<br><br>          Plaintiffs,<br><br>v.<br><br>EUGENE SCALIA, in his official<br>capacity as United States Secretary of Labor,<br>     200 Constitution Ave. NW<br>     Washington, DC 20210,<br><br>and<br><br>U.S. DEPARTMENT OF LABOR,<br>     200 Constitution Ave. NW<br>     Washington, DC 20210,<br><br>          Defendants. | Civil Action No. 20-3588 |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1. Congress created the H-2A program, so named after the relevant provision of the Immigration and Nationality Act (INA), to allow agricultural employers to employ foreign workers in temporary or seasonal positions when they cannot fill those positions with domestic farmworkers. 8 U.S.C. § 1101(a)(15)(H)(ii)(a). In so doing, Congress recognized that, without regulation, employers might pay foreign workers lower wages, which would have the effect of depressing wages and working conditions for U.S. workers. Accordingly, it specified that an employer cannot employ H-2A workers unless the Secretary of Labor has certified that doing so "will not adversely affect the wages and working conditions of workers in the United States similarly employed." 8 U.S.C. § 1188.

2. To guard against such wage depression, defendant Department of Labor (DOL) establishes an Adverse Effect Wage Rate (AEWR), which sets a minimum wage that H-2A employers must pay both U.S. farmworkers and H-2A workers. For decades, DOL has calculated the AEWR based on data from the Farm Labor Survey (FLS), a comprehensive assessment of the wages actually paid by agricultural employers.

3. In July 2019, DOL issued a proposed rule to make sweeping changes to the H-2A program. DOL, Proposed Rule, Temporary Agricultural Employment of H-2A Nonimmigrants in the U.S., 84 Fed. Reg. 36168 (July 26, 2019) (NPRM). That NPRM, however, included only minor modifications to the longstanding AEWR structure and proposed to continue using the FLS to establish and annually adjust AEWRs. *Id.*

4. In November 2020, though, DOL published a final rule, effective December 21, 2020, that radically alters how the AEWR is calculated. DOL, Final Rule, Adverse Effect Wage Rate Methodology for the Temporary Employment of H-2A Nonimmigrants in Non-Range

Occupations in the United States, 85 Fed. Reg. 70445 (Nov. 5, 2020) (the AEWR Rule). The AEWR Rule freezes for two years the AEWRs for the vast majority of agricultural jobs at 2020 levels, which were based on the 2019 FLS. Even after the two-year freeze, DOL will not look to the actual wages in the occupations and industries in which H-2A workers are employed. Rather, beginning in 2023, and annually thereafter, DOL will adjust the AEWRs by the percentage change in the Employment Cost Index (ECI), a measure of *non-farm* wages calculated by DOL. 85 Fed. Reg. at 70446. DOL will use the percentage change in the ECI for the preceding 12-month period, *id.* at 70455, locking in the wage depression that will result from the two-year freeze.

5. Neither a two-year freeze nor the use of an ECI-adjusted 2019 wage for 2023 onward was mentioned in DOL's 2019 notice of proposed rulemaking, and neither is a logical outgrowth of the agency's limited discussion of changes to the AEWR. DOL's failure to comply with the basic requirements of notice-and-comment rulemaking, 5 U.S.C. §553(b)–(c), requires the AEWR Rule to be set aside. 5 U.S.C. § 706(2)(D).

6. Even if the agency had given appropriate notice of these changes to the AEWR, such changes are arbitrary, capricious, and contrary to law, and should be set aside. 5 U.S.C. § 706(2)(A). DOL's adoption of the Rule is inconsistent with its mandate to ensure that the admission of agricultural guest workers does not adversely affect the wages of U.S. farmworkers. Freezing wages at 2019 levels until 2023, and then adjusting the frozen AEWR using an index that does not include the agricultural sector, will result in the employment of foreign workers at wage rates that adversely affect similarly employed U.S. workers. DOL acknowledges that the AEWR Rule will result in H-2A workers losing an average of $167.76 million in wages annually and as much as $1.68 billion over the next decade. 85 Fed. Reg. at 70472. Although DOL does not quantify the wage losses that will be experienced by U.S. workers in corresponding employment,

DOL acknowledges that lower wages for H-2A workers will drive down the wages of U.S. workers. *Id.*

7. Nowhere in the Rule does DOL provide a reasoned explanation for the freeze in wages or the use of the ECI to index the AEWR once the freeze ends, despite the conceded impact on wages of U.S. workers. While DOL makes the conclusory assertion that these changes are necessary to protect U.S. employers, its reasoning is illogical and not supported by the record— and is untethered to DOL's statutory obligations.

8. Because the AEWR Rule was promulgated without observance of procedure required by law, and is arbitrary, capricious, and contrary to law, the AEWR Rule should be vacated in its entirety.

## JURISDICTION AND VENUE

9. This Court has jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702.

10. Venue is proper in this district under 28 U.S.C. § 1391(e)(1).

## PARTIES

11. Plaintiffs are residents of the state of Texas. Each of them is a U.S. worker within the meaning of 20 C.F.R. § 655.103(b). They are experienced farmworkers who work for agricultural businesses across the country. Each of the Plaintiffs regularly travels to farms located in other states to obtain well-paid, temporary agricultural employment.

12. Plaintiff Ricardo Betancourt is a lawful permanent resident of the United States living in Mercedes, Texas. Since 1980, he has worked as a farmworker in locations across the country, in seasonal positions harvesting corn, wheat, watermelon, and other crops. He is currently looking for seasonal farmworker employment, and he hopes to begin work shortly as cabbage harvesting season begins. In determining whether to seek a particular seasonal employment

position, he considers the wage being offered. In his experience, he competes with H-2A workers for employment, and agricultural employers prefer to hire H-2A workers over United States workers. He is concerned that any decrease in the wage rate paid to H-2A workers will decrease the rate he is offered.

13. Plaintiff Oscar Gutierrez is a United States citizen living in McAllen, Texas. For the past seven years, he has worked as a farmworker in Texas, Iowa, and Mississippi, in seasonal positions harvesting watermelon, cabbage, and wheat, and operating a cotton gin. He is currently looking for seasonal farmworker employment. In determining whether to seek a particular seasonal employment position, he considers the wage being offered. He is concerned that if employers can pay H-2A workers less, employers will offer him lower wages, and that such wages will not be sufficient for him to survive.

14. Plaintiff Severiano Gutierrez is a United States citizen living in McAllen, Texas. He has been a seasonal farmworker for nearly thirty years in locations throughout the United States. For the past five years, he has worked harvesting watermelon and cabbage in Texas, and corn and wheat in Illinois and Iowa. He expects to begin working on a cabbage farm in Texas in the next few weeks as the cabbage harvesting season begins. He works alongside H-2A workers in these jobs, and is paid the same rate as the H-2A workers. He is concerned that any changes to the wages paid H-2A workers will change the wages he offered, and would make it impossible for him to keep working as a farmworker.

15. Plaintiff Olegario Lopez is a lawful permanent resident of the United States living in Weslaco, Texas. He has been a farmworker in seasonal positions throughout the United States for the past nineteen years, with positions harvesting pumpkins and corn, and operating cotton gins. He works alongside H-2A workers in some of these jobs, and is paid the same rate as the H-

2A workers. He expects to begin working bagging corn in Indiana next month. In his experience, some agricultural employers prefer to hire H-2A workers over United States workers, particularly if they can pay H-2A workers lower wages.

16. Defendant Eugene Scalia is the Secretary of Labor and is charged with the supervision and management of all decisions and actions within DOL. Plaintiffs sue Secretary Scalia in his official capacity.

17. Defendant DOL is an agency of the United States within the meaning of the APA. DOL is responsible for issuing labor certifications in connection with petitions to import aliens as H-2A workers, as set forth in the INA, 8 U.S.C. § 1188.

## STATUTORY AND REGULATORY BACKGROUND

18. The H-2A program allows U.S. employers to bring foreign nationals to the United States to fill temporary agricultural jobs where the supply of U.S. workers is insufficient. To participate in the H-2A program, eligible employers must complete a multi-step process.

19. Prior to filing a petition with U.S. Citizenship and Immigration Services (USCIS), a division of the Department of Homeland Security, the employer must seek and obtain a temporary labor certification from DOL's Office of Foreign Labor Certification (OFLC) confirming that "there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition," and that "the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed." 8 U.S.C. § 1188(a)(1).

20. DOL has promulgated regulations that govern the H-2A labor certification process. 20 C.F.R. Ch. V, Pt. 655, Subpt. B. These regulations contain numerous specific requirements for employers seeking to hire workers through the H-2A program.

21. DOL's regulations require that an employer offer, advertise in its recruitment efforts, and pay a wage that is the highest of the AEWR, the prevailing hourly wage or piece rate, the agreed-upon collective bargaining wage, or the Federal or State minimum wage. 20 C.F.R. § 655.120; *see also* 20 C.F.R. § 655.122(l). As DOL has explained, the inclusion of the AEWR, apart from the prevailing wage, "reflects a longstanding concern that there is a potential for the entry of foreign workers to depress the wages and working conditions of domestic agricultural workers." NPRM, 84 Fed. Reg. at 36180. In the H-2A program, "concerns about wage depression from the importation of foreign workers are particularly acute because access to an unlimited number of foreign workers in a particular labor market and crop activity or agricultural activity could cause the prevailing wage of workers in the United States similarly employed to stagnate." *Id.* "[T]he AEWR protects against localized wage depression that might occur in prevailing wage rates." *Id.*

22. Except for a brief period in 2009 and 2010, DOL "has always used the FLS to set the H-2A AEWR." *Id.* at 36180. The FLS collects information from 10,000 to 13,000 farms and ranches on a quarterly basis. *Id.* Since 2014, the FLS has collected these data by Standard Occupational Classifications (SOC). *Id.* at 36181. The largest SOC agricultural categories are crop workers (SOC Code 45-2092), ranch and aquaculture workers (SOC Code 45-2093), and agricultural equipment operators (SOC Code 45-2091). These SOC categories also account for the vast majority of H-2A certifications. For example, in Fiscal Year 2020, DOL certified 275,460

positions to be potentially filled by H-2A workers, 81% of which were crop workers, 5.6% of which were agricultural equipment operators, and 4.0% were ranch or aquaculture workers.

23. Since 2010, DOL has set the AEWR for a state or region at the annual weighted average hourly wage for field and livestock workers (combined) as published in the FLS. 20 C.F.R. § 655.103. This figure includes most, but not all, of the agricultural SOC groupings. 84 Fed. Reg. at 36181. Although the FLS collects data by SOC, it does not report wages at that level of specificity. Rather, the FLS reports wages for field workers, livestock workers, field and livestock workers combined, and total hired workers. *Id.*

24. FLS data are collected each calendar quarter on an ongoing basis. DOL adjusts the AEWRs annually to reflect year-to-year changes in wages. *Id.* at 36180.

## THE JULY 2019 NOTICE OF PROPOSED RULEMAKING (NPRM)

25. In July 2019, DOL issued a notice proposing numerous changes to its regulations governing the H-2A program. 84 Fed. Reg. 36168.

26. In the NPRM, DOL proposed to continue setting AEWRs based on the FLS, with only minor modifications. *Id.* at 36171, 36180. Rather than using a single AEWR based on the combined average wages of all crop and livestock workers, DOL proposed issuing separate AEWRs for each occupational category for which the FLS collects data, including crop workers (SOC Code 45-2092), ranch and aquaculture workers (SOC Code 45-2093), and agricultural equipment operators (SOC Code 45-2091). *Id.* at 36180–81.

27. DOL justified these changes based on its concern that the current AEWR methodology depressed the wages of higher-paid agricultural occupations, such as agricultural equipment operators, construction laborers, and supervisors. *Id.* at 36171. This situation resulted in part because of DOL's routine certification of these higher-skilled jobs at the AEWR (i.e.,

certification that paying the AEWR would have no adverse effect) even when the prevailing wage for the occupation was higher than the applicable AEWR. DOL's failure to impose the prevailing wage requirement in these instances in violation of the requirements of 20 C.F.R. § 655.120(a) is the subject of litigation before this Court. *See Garcia v. Scalia*, No. 18-cv-1968-RDM (D.D.C.).

28. Under the proposed rule, DOL would continue to use FLS data to determine the AEWRs for all major agricultural occupational groups for which FLS data were available at the state or regional level, categories which DOL estimated included approximately 89 percent of all H-2A workers. 84 Fed. Reg. at 36182.

29. For those agricultural occupations for which there were insufficient FLS data to calculate a state or regional wage, DOL proposed setting the AEWRs using the statewide annual wage from the Occupational Employment Statistics (OES) survey conducted by DOL's Bureau of Labor Statistics. *Id.* at 36171. For this small subset of occupations and this subset only, DOL invited comments as to whether future AEWRs should be computed by adjusting past AEWRs through the use of one of a number of possible governmental indices, including the ECI, which measures changes in labor costs for non-farm employers. *Id.* at 36182.

30. DOL did not propose or seek comments regarding use of the ECI or any other indexing method to compute AEWRs for any of the H-2A occupations for which FLS data allowed calculation of AEWRs at a state or regional level. Nothing in the NPRM indicated that DOL was considering using an index such as the ECI to adjust AEWRs for the major occupational categories: crop workers (SOC Code 45-2092), ranch hands (45-2093), and agricultural equipment operators (45-2091). According to DOL's Fiscal Year 2020 statistics, these three categories comprised over 97% of all H-2A certifications.

31.     DOL did not discuss or propose instituting a transitional period during which DOL would temporarily halt the annual setting of AEWRs.

32.     DOL received over 83,000 public comments in response to the NPRM. 85 Fed. Reg. 70448. On information and belief, none of the comments discussed a possible moratorium or freeze of AEWRs during a transitioning to a new AEWR methodology, and none discussed the possibility of using changes in the ECI to adjust the AEWRs in future years for the major occupational categories.

## USDA'S SUSPENSION OF THE FARM LABOR SURVEY

33.     On September 30, 2020, USDA announced that it was suspending data collection through the FLS beginning in October 2020. USDA, Notice of Revision to the Agricultural Labor Survey and Farm Labor Reports by Suspending Data Collection for October 2020, 85 Fed. Reg. 61719 (Sept. 30, 2020).

34.     On October 28, 2020, the U.S. District Court for the Eastern District of California issued a temporary restraining order and preliminary injunction enjoining USDA's suspension of the FLS. *United Farm Workers v. Perdue*, No. 1:20-cv-01452-DAD, 2020 WL 6318432 (E.D. Cal. Oct. 28, 2020). In its decision, the court found that plaintiffs were likely to succeed on the merits of their claim that USDA arbitrarily and capriciously failed to consider the disruptive effect that the suspension would have on the H-2A program and farmworker wages, *id.* at *9–*10, and that they had raised at least "serious questions" as to other arguments, *id.* at *10–*14. After the AEWR rule was issued, USDA moved to dissolve the preliminary injunction. USDA's motion was denied.

## THE AEWR RULE

35. On November 5, 2020, DOL issued a final rule purportedly based on the July 2019 NPRM. The new rule dealt exclusively with changes to AEWR methodology. DOL stated that a subsequent final rule would address the other issues in the NPRM. 85 Fed. Reg. at 70445.

36. DOL stated that the AEWR Rule was prompted by USDA's September 30, 2020 announcement that it was suspending the FLS. While acknowledging that USDA is under court order to proceed with the collection of FLS data for 2020, *id.* at 70446, DOL asserted that immediate action was nevertheless needed because no statutory or regulatory authority required USDA to continue to conduct the survey—a fact that had been true throughout the many decades during which DOL had used the FLS to calculate AEWRs on an annual basis. *See id.*

37. The AEWR Rule made two major changes to the AEWR methodology. First, DOL froze AEWRs at the 2020 level for a two-year "transition period." *Id.* The 2020 AEWRs, which are based on the 2019 FLS data, will serve as the AEWRs for 2021 and 2022, regardless of changes in farmworker wages during that period.

38. Second, beginning in 2023, DOL will annually adjust the AEWR, but without any examination of actual farm wages. Rather, DOL will adjust the 2020 AEWRs by the percentage change in the ECI, a DOL measure of labor costs for non-farm employers, for the preceding twelve months. *Id.* The ECI adjustment for 2023 will be applied to the 2020 AEWRs, which will have been used, unchanged, for three years. Even then, the AEWRs will be adjusted by the change in the ECI for only the preceding twelve months.

39. Neither of these two changes was proposed, discussed, or mentioned in the July 2019 NPRM.

40. The AEWR rule did not invoke the good cause exception to the APA's notice and comment requirements under 5 U.S.C. § 553(b)(3)(B).

41. Freezing AEWRs for 2021 and 2022, and allowing employers to pay H-2A workers during those years based on the 2020 AEWR, will adversely affect the wages of U.S. farmworkers. The 2021 and 2022 AEWRs will not reflect any increases in farmworker wages occurring since 2019, the date of the FLS data on which the frozen AEWRs were calculated. Given historical trends and basic economic theory, farm labor wages likely will rise appreciably throughout this period. Indeed, DOL acknowledges that in recent years, farmworker wages have increased significantly faster than inflation or wage increases in the overall U.S. economy. 85 Fed. Reg. at 70452. Allowing employers to pay foreign H-2A workers in 2021 and 2022 at the 2020 AEWR, a wage below the 2021 and 2022 wages of similarly employed U.S. workers, will cause the very adverse effect DOL is statutorily charged with avoiding.

42. DOL insists that the two-year AEWR freeze in 2021 and 2022 is needed to provide employers with a reasonable amount of time to plan their labor needs and adjust their operations to the new AEWR methodology. 85 Fed. Reg. 70467. However, DOL does not explain why a transition period is necessary given the facts that AEWRs have been adjusted annually since 1987 and that the index chosen by DOL will result in more gradual, incremental adjustments than in the past. Moreover, DOL's explanation shows that it failed to consider obvious alternatives, including the prospect of continuing to set the AEWRs based on the annual FLS, which would not entail a new methodology.

43. DOL justifies the use of the 2020 AEWRs, computed from data collected in 2019, as the base wages for adjusting AEWRs beginning in 2023 as necessary to eliminate any "volatility" that might otherwise result if employers were required to pay AEWRs that reflected

actual wage increases that occurred within the farm labor market between 2019 and 2022. But the mere fact that market wages fluctuate over time is not in itself a reason for DOL to ignore actual market wages. DOL made no attempt to explain how this was relevant to DOL's statutory obligation to ensure that the H-2A program does not have an adverse effect on the wages and working conditions of U.S. workers, or to justify why such "volatility" allowed it to disregard that obligation.

44.     DOL also failed to explain how using the non-farm-labor based ECI to index the 2020 AEWRs would protect the wages and working conditions of U.S. farmworkers. Indeed, DOL acknowledges that the annual ECI adjustments over the last decade have been less than the amount the AEWRs typically increased based on FLS data, which tracks actual farmworker wages. Even if the ECI did accurately reflect changes in farmworker wages, it is arbitrary to begin adjusting the AEWR based on the change to the ECI during the preceding twelve months, when the AEWR will have been unchanged for three years.

**FIRST CLAIM FOR RELIEF**
**(Administrative Procedure Act – Failure to Observe Procedure Required by Law)**

45.     The AEWR Rule is a legislative rule, and thus DOL was required to comply with the notice and comment requirements of the APA, 5 U.S.C. § 553(b)–(c).

46.     DOL failed to comply with these requirements as the NPRM failed to provide interested parties any indication that DOL was contemplating (1) freezing the AEWR at the 2020 rate for two years or (2) calculating the AEWR for 2023 and future years by adjusting the 2019 rate based on the ECI, or any other wage index.

47.     Because these changes to the AEWR methodology were not a logical outgrowth of the NPRM, interested members of the public were deprived of notice and a meaningful opportunity to comment, as required by the APA, 5 U.S.C. § 553(b)–(c). DOL thus failed to observe procedures

required by law, in contravention of the APA, 5 U.S.C. § 706(2)(D).

## SECOND CLAIM FOR RELIEF
### (Administrative Procedure Act – Agency Action Contrary to Law)

48. 8 U.S.C. §§ 1101(a)(15)(H)(ii)(A) and 1188 require DOL to ensure that H-2A workers are only admitted under conditions that "will not adversely affect the wages and working conditions of similarly employed U.S. workers."

49. The AEWR Rule will allow an adverse effect by:

   a. Freezing the AEWR at 2020 levels (based on 2019 data) until 2023;

   b. Indexing AEWRs after the freeze based on ECI data that specifically excludes agricultural wages; and

   c. Applying the 2021-2022 change in the ECI data to the 2020 AEWR to generate the 2023 AEWR, thereby skipping the increases that occur between 2019-2020 and 2020-2021.

50. The AEWR Rule is thus not in accordance with law. 5 U.S.C. § 706(2)(A).

## THIRD CLAIM FOR RELIEF
### (Administrative Procedure Act –Arbitrary and Capricious Agency Action)

51. In undertaking final agency action, an agency must engage in reasoned decisionmaking, considering all relevant factors, and "cogently explain[ing] why it has exercised its discretion in a given manner." *Motor Veh. Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 US. 29, 43 (1983).

52. In issuing the AEWR Rule, DOL failed to provide a reasoned, non-arbitrary explanation for:

   a. The decision to freeze AEWRs at the 2020 level until 2023;

   b. The decision to switch away from an AEWR methodology based directly on annual surveys and instead adopt an AEWR methodology that sets the 2020 AEWR as a base rate and then increases or decreases that rate based on percentage changes in the ECI data (after a two-year freeze); and

  c. The decision to index the 2020 AEWR beginning in 2023 using the percentage change in ECI for the preceding twelve months.

53. Because the Final Rule fails to provide a reasoned, non-arbitrary explanation for these changes, the Final Rule is arbitrary and capricious. 5 U.S.C. § 706(2)(A).

## REQUEST FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Court:

A. Declare the AEWR Rule unlawful because it was promulgated without observance of procedure required by law;

B. Declare the AEWR rule arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

C. Vacate and set aside the AEWR Rule in its entirety;

D. Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees; and

E. Grant other such relief as this Court may deem proper.

Dated: December 10, 2020

Respectfully submitted,

/s/ Michael T. Kirkpatrick

| | |
|---|---|
| Gregory S. Schell | Michael T. Kirkpatrick |
| (*Pro Hac Vice* pursuant to LCvR 83.2(g)) | D.C. Bar No. 486293 |
| Florida Bar No. 287199 | Adam R. Pulver |
| SOUTHERN MIGRANT LEGAL SERVICES | D.C. Bar No. 1020475 |
| A Project of Texas RioGrande Legal Aid, Inc. | Public Citizen Litigation Group |
| 9851 Daphne Avenue | 1600 20th Street NW |
| Palm Beach Gardens, FL 33410-4734 | Washington, DC 20009 |
| (561) 627-2108 | (202) 588-1000 |
| gschell@trla.org | mkirkpatrick@citizen.org |
| | |
| Douglas L. Stevick | Edward Tuddenham |
| (*Pro Hac Vice* pursuant to LCvR 83.2(g)) | (*Pro Hac Vice* pursuant to LCvR 83.2(g)) |
| Texas Bar No. 00797498 | N.Y. Bar No. 2155810 |
| TEXAS RIOGRANDE LEGAL AID, INC. | 23 Rue du Laos |
| 5439 Lindenwood Avenue | 75015 Paris |

Saint Louis, MO 63109
(314) 449-5161
dstevick@trla.org

Elizabeth T. Leiserson
(*Pro Hac Vice* pursuant to LCvR 83.2(g))
Tennessee Bar No. 036095
SOUTHERN MIGRANT LEGAL SERVICES
A Project of Texas RioGrande Legal Aid, Inc.
311 Plus Park Blvd., Ste. 135
Nashville, TN 37217
(615) 538-0725
eleiserson@trla.org

France
33 6 84 79 89 30
Email: etudden@prismnet.com